191 So.2d 873 (1966)
MEXIC BROS., INC.
v.
Karl W. SAUVIAC and Mrs. Barbara G. Sauviac.
No. 2341.
Court of Appeal of Louisiana, Fourth Circuit.
November 7, 1966.
*874 Salomon & Rudman, Laurence D. Rudman, New Orleans, for plaintiff-appellee.
Calvin H. McBride, New Orleans, for defendants-appellants.
Before McBRIDE, REGAN and BARNETTE, JJ.
BARNETTE, Judge.
The defendants have appealed from a judgment against them in the sum of $429.10 with 8 percent per annum interest from October 20, 1965, plus 25 percent attorney's fees and costs. The alleged indebtedness upon which this action was brought arose out of what plaintiff contended was a completed contract of sale of certain jewelry.
The defendant Karl W. Sauviac resided at the home of his mother at 2675½ Gladiolus Street in the city of New Orleans, on October 13, 1965, when he and Miss Barbara Gambino, codefendant, entered a purchase agreement for the jewelry. Shortly thereafter the defendants were married and established their matrimonial domicile at 2725 Paris Avenue in New Orleans.
On December 15, 1965, plaintiff filed suit in the First City Court of the City of New Orleans against the defendants, and on December 29, 1965, a deputy constable went to 2675½ Gladiolus Street to make service of citation on them. When a lady came to the door he inquired if she were "Mrs. Sauviac." When she answered affirmatively, he handed her the citations addressed to the defendants and left immediately without interrogating the lady to determine if she were the Mrs. Sauviac named in the citation or if that were the domicile of Karl W. Sauviac and Mrs. Barbara G. Sauviac. Obviously, he assumed the lady to be Mrs. Barbara G. Sauviac, for his official returns indicate personal service of citation on her and domiciliary service on Karl W. Sauviac by handing same to Mrs. Barbara G. Sauviac, "a member of his domiciliary establishment." It is an undisputed fact that the lady to whom the citations were handed was Mrs. Evelyn Sauviac, mother of Karl W. Sauviac. She did not know what the papers were until after the constable had left the premises. She then notified her son and daughter-in-law at their domicile address.
Pursuant to LSA-C.C.P. arts. 5001-5002, defendants filed declinatory exceptions of insufficiency of service of process, improper citation, and lack of jurisdiction over their persons, along with their answer of general denial. Had they stopped there, there would have been no doubt of the validity of their declinatory exceptions. But, defendants continued and, "with full reservation of the exceptions filed herein," assumed the position of plaintiffs in reconvention praying for judgment of damages against the plaintiffdefendant in reconvention.
The trial court referred the defendants' exceptions to the merits and then overruled them from the bench during the course of the trial. Before considering the merits of the case, we must determine whether defendants, by filing a reconventional demand, even with express reservation of rights under the declinatory exceptions, have waived those exceptions and submitted themselves to the court's jurisdiction.
*875 LSA-C.C.P. arts. 5001-5002 relate to procedure in city courts and provide that it shall be the same as provided by law in the district court of the parish where the court sits with certain exceptions. The only exception pertinent to the question presented here is "A defendant shall incorporate in his answer all of the exceptions on which he intends to rely."
The codal article specifically refers to "exceptions" and "answer." Exceptions are defined in LSA-C.C.P. art. 921 as follows:
"An exception is a means of defense, other than a denial or avoidance of the demand, used by the defendant, whether in the principal or an incidental action, to retard, dismiss, or defeat the demand brought against him."
LSA-C.C.P. art. 1003 prescribes the form of the answer and its contents as follows:
"The answer shall comply with Articles 853, 854, and 863 and, whenever applicable, with Articles 855 through 861. It shall admit or deny the allegations of the petition as required by Article 1004, state in short and concise terms the material facts upon which the defenses to the action asserted are based, and shall set forth all affirmative defenses as required by Article 1005. It shall also contain a prayer for the relief sought. Relief may be prayed for in the alternative."
A reconventional demand differs significantly from an exception or an answer. It is an incidental demand under the provisions of LSA-C.C.P. art. 1031:
"A demand incidental to the principal demand may be instituted against an adverse party or against a third person.
"Incidental demands are reconvention, intervention, and the demand against third parties."
LSA-C.C.P. art. 1032 provides:
"An incidental demand shall be commenced by a petition which shall comply with the requirements of Article 891. An incidental, demand instituted by the defendant in the principal action may be incorporated in his answer to the principal demand. In this event, the caption shall indicate appropriately the dual character of the combined pleading." (Emphasis added.)
As the Supreme Court pointed out in Stringfellow v. Nowlin Bros., 157 La. 683, 686, 102 So. 869, 870 (1925):
"One who desires relief by means of a reconventional demand must institute [emphasis in the original] such a demand in court. His position, in reconvening, becomes that of plaintiff. So much is this the case that, although the demand be inserted in the answer, it is not considered as a part of the answer [emphasis added], but as a petition setting forth a distinct cause of action. * * *"
A reconventional demand is not, therefore, an "exception," nor an "answer," nor an "affirmative defense," which is required to be a part of the answer; but it is an incidental demand which may be incorporated in the answer. Thus it is not a pleading which under LSA-C.C.P. arts. 5001-5002 is required to be incorporated in the answer. Therefore, we must look to the general provisions of the Code of Civil Procedure to determine what rule applies in the district court. LSA-C.C.P. art. 7 states in part:
"Except as otherwise provided in this article, a party makes a general appearance which subjects him to the jurisdiction of the court and impliedly waives all objections thereto when, either personally or through counsel, he seeks therein any relief other than:

* * * * * *
(5) Dismissal of the action on the ground that the court has no jurisdiction over the defendant.

*876 * * * * * *
"When a defendant files a declinatory exception which includes a prayer for the dismissal of the action on the ground that the court has no jurisdiction over him, the pleading of other objections therein, the filing of the dilatory exception therewith, or the filing of the peremptory exception or an answer therewith when required by law, does not constitute a general appearance." (Emphasis added.)
The provision allowing filing of peremptory exceptions and an answer along with the exception to jurisdiction "when required by law" clearly refers to the city courts under Articles 5001-5002.
Two questions are posed in this suit as it relates to Article 7. First, does the filing of a reconventional demand constitute a prayer for "any relief" with a consequent implied waiver of the exception to jurisdiction? Secondly, does an express reservation of rights under the exception avoid what otherwise would be a waiver; or, stated in the terms of the article, is the waiver necessarily implied, or can it be rebutted by an express negation?
The answers to both questions may be found in examining the jurisprudential background of Article 7. The Code of Practice did not attempt to define an appearance or its effect on jurisdiction. The rules were developed by our courts, which apparently adopted the basic principle from the Common Law. Stanley v. Jones, 197 La. 627, 2 So.2d 45 (1941); True Tag Paint Co. v. Wellman, 142 La. 1038, 78 So. 109 (1918); Dyson v. Brandt, 9 Mart. (O. S.) 493 (1821).
Initially the rule was all inclusive. In considering the effect of an exception of lis pendens filed with an exception to citation, the Supreme Court said in City of New Orleans v. Walker, 23 La.Ann. 803 (1871): "A want of citation is cured by the appearance of defendant in the suit for any other purpose than to allege the want of citation." (Emphasis added.) The rule was also applied in other cases to find a waiver of an exception to citation when the particular defendants filed other pleadings. These pleadings were: an answer in True Tag Paint Co. v. Wellman, supra; a motion for an extension of time to plead in Stanley v. Jones, supra; a petition in intervention in Adams v. Ross Amusement Co., 182 La. 252, 161 So. 601 (1935); and a peremptory exception in Standard Indem., Inc. v. Albrought, 81 So.2d 448 (La.App. 1st Cir. 1955).
More specifically in point here is the case of Stringfellow v. Nowlin Bros., supra, in which the filing of a reconventional demand was held to constitute a waiver of an exception to citation.
The all-inclusive nature of the rule which led the courts to find a waiver in an appearance for any other purpose than to except to citation or jurisdiction was modified to some degree by later jurisprudence. A 1936 amendment to Code of Practice art. 333 required filing of all dilatory exceptions (which, under C.P. art. 331, included a declinatory exception to jurisdiction) in limine litis and at one time. The Supreme Court ruled in State v. Younger, 206 La. 1037, 20 So.2d 305 (1944), that because of the amendment other dilatory exceptions could be filed with an exception to citation without waiving the objection to jurisdiction. In Chapman v. Irwin, 157 La. 920, 103 So. 263 (1925), the Court allowed a defendant to seek dissolution of an attachment issued on the ground of nonresidence without waiving his exception to citation.
As stated above, LSA-C.C.P. art. 7 is generally a codification of the jurisprudential rules with some changes. The reporters point this out in Comment (b) following the article. The article states the general rule that seeking any relief constitutes a waiver, and then specifies certain exceptions. It adopts, with slight modification, the rule as to the effect of filing all dilatory exceptions together found in State v. Younger, supra. It adopts the *877 exception in the case of a defendant seeking to dissolve an attachment issued on the ground of nonresidence which was recognized in Chapman v. Irwin, supra. The reporters felt that the rule was unduly harsh when applied to a motion for an extension of time to plead, as in Stanley v. Jones, supra, and provided a specific exception in Article 7 to allow such a motion to be filed without its constituting a waiver of objection to jurisdiction.
The precise manner in which the prior jurisprudence was sifted and weighed by the reporters for the Code of Civil Procedure leads us to the conclusion that the omission of any reference to the filing of a reconventional demand in Article 7 is of controlling significance. Such a filing constituted a waiver of objection to jurisdiction before the Code of Civil Procedure was enacted, and there has been no change in the law.
Having thus answered the first question posed above affirmatively, we must now consider the effect of defendants' express reservation of their rights under their exceptions. This question is answered succinctly in True Tag Paint Co. v. Wellman, supra, when the Court said:
"* * * Defendant stated in the exception that he appeared for the sole purpose of the exception, and in the answer he stated that he filed the answer only on condition that the exception be overruled, and with full reserve of the exception; but the statement that defendant appeared for the sole purpose of the exception was contradicted by the fact that he appeared also for the purpose of the answer, since he did as a matter of fact file the answer. * * *" 142 La. at 1041, 78 So. at 110.
Many of the cases cited above speak in terms of a waiver resulting from an appearance without reservation of rights under an exception to citation. However, it must be pointed out that in those cases, since no reservation was made, the issue of the effect of a reservation of rights was not before the courts. The only instance which we can find in the jurisprudence in which the issue was presented was in the True Tag Paint Co. case.
Having reached the conclusion that the defendants are properly before the court, by reason of their waiver of the declinatory exceptions, we now direct our consideration to the merits.
On the evening of October 13, 1965, the defendants, who were engaged to be married on November 13, 1965, went to Mexic Bros., Inc., a retail jewelry store in New Orleans to select wedding rings. Certain rings were shown them in yellow gold, but they preferred rings of the same design and quality in white gold, which plaintiff did not have in stock. Plaintiff agreed to order the rings, and defendants made a payment of $20. What purports to be a sales slip was prepared by the salesman on a printed form, dated "10/13/1965," followed by the name and address of Mr. Sauviac, listing the following items:

Bridal Set $300
Gent's Ring 97.50
 ______
 397.50
C + C 39.75 (Explained as carrying charges)
Federal, City
and State Tax 11.85
 ______
 $449.10

*878 Following this are the entries in appropriate spaces indicating "Down Payment 20.00," "Semimonthly 12.50." Below these figures in very fine print is the following:
"Received from Mexic Bros., New Orleans, La., the merchandise as described and valued above in good condition for which I promise to pay to the order of Mexic Bros. said amount for value received. The obligation is payable at the rate as indicated above until paid in full. In case of default of any payment, whole or in part, the entire balance becomes due and I hereby agree to pay 8% of the balance due as delinquent carrying charges and also agree to pay all costs of collection including 25% Attorney fees of said balance and charges due should the claim be placed in the hands of an Attorney for collection."
The signatures of Karl Sauviac and Barbara Gambino follow, and after the printed word "Salesman" the slip is signed "Billy."
Notwithstanding the acknowledgement of delivery of the merchandise printed on the sales slip, it is admitted by all parties that no delivery of the rings has ever been made to defendants. Plaintiff claims to have tendered delivery (which is disputed) and declared a readiness to deliver the rings at the trial below. However, the rings are still in plaintiff's possession, and there is no evidence that defendants ever saw them.
On December 15, 1965, plaintiff filed suit in the First City Court of the City of New Orleans. The petition purports to be a suit on "account" for merchandise "sold and delivered." It is significant, as will be pointed out later herein, that plaintiff's petition claims interest not from October 13, 1965, but from October 20, 1965. It further alleged: "On said account defendant has paid $20.00 leaving a balance of $429.10 due and unpaid." In support of these allegations plaintiff attached to its petition what purports to be an itemized statement of account. This statement shows the same items and charges as shown on the sales slip, except that it shows the cash payment of $20 to have been credited on October 20, 1965. The statement is sworn to by William Mexic.
Clearly, on the basis of plaintiff's allegations, this was a suit on account, and we know of no law which would entitle plaintiff to 8 percent interest thereon from its inception nor to 25 percent attorney's fee. Defendants made timely objection to testimony going beyond the pleadings, whereupon plaintiff, confronted with the inconsistency of its pleadings, moved for, and was granted, leave to amend its petition by inserting the words, "tendered delivery," and was permitted to shift its position from suit on account to one of suit on a contract of sale as evidenced by the sales slip attached to its petition.
The trial court held that the instrument which we have referred to as the sales slip was a contract of sale of merchandise, citing LSA-C.C. arts. 2439 and 2456, and that the evidence did not support defendants' contention that it was thereafter rescinded. In brief, the court held that there was a concurrence of the three essential elements of a sale, the thing, the price and consent, and in effect ordered specific performance.
From a careful examination of the record before us, we must conclude, first, that the sales slip does not disclose the actual agreement between the parties, and secondly, that the essential element of consent has not been proved. The preponderance of the evidence supports the contention of defendants that the sales slip, upon which plaintiff bases its case and which was the basis of the judgment rendered below, does not contain the full agreement between the parties. The evidence also shows that there was no intention on the part of the seller to deliver or part with title to the rings until after the payment of an additional $100 by the defendants. The testimony of the defendants that the $20 deposit was earnest money given to bind *879 the promise to sell is corroborated by plaintiff's own pleadings and evidence.
The defendant Karl Sauviac testified on cross-examination as follows:
"Q Did you ask Mr. Mexic or the salesman who waited on you to order the rings, the white gold rings?
"A It was my understanding that he was supposed to get the rings and for us to see them. That was supposed to be that next Saturday, and we would put a $20.00 deposit for him to get the rings and next Saturday we were supposed to bring him another hundred dollars to close the sale if we considered buying, if we wanted to get the rings, but he was supposed to get the rings for that Saturday and let us see them."
Later, on direct examination, he testified:
"Q Would you describe how you came to sign the document marked P-1 [the sales slip]?
"A The night of October 13, my wife and myself went to Mexic Brothers, which has already been said, to buy the rings, to look at a set of rings to purchase from Mr. Bill Mexic and he waited on us and brought us out a couple of sets of rings, but before we decided, before my wife decided she liked this set here and it was in yellow gold but she wanted it in white gold and he said I don't have the white gold in stock, I will have to order it for you, and he said, I will get them, but you will have to put a $20.00 deposit on the rings, so I gave him the $20.00 deposit on the rings and he said all right. This isn't enough to buy the rings. You will need an additional hundred dollars or more than that. How much can you afford to put down on it? And I said, well, we will put down a hundred dollars on the rings come Saturday and he said okay, so he said sign this, and frankly I signed that paper there and I didn't know that it was a contract to buy the rings when I signed it."
Mrs. Barbara G. Sauviac testified as follows:
"Q Now, what was the substance of that conversation on the 15th, Mrs. Sauviac?
"A Well, Mr. Mexic had wanted us to bring in an additional $100.00 to complete the sale because he said $20.00, it was $20.00, but I mean, he required more, so I was supposed to go down that Saturday to bring him the hundred dollars. Well, something came up with the carwe couldn't afford it, we had to use the money for the automobile, so Karl had called Mr. Mexic on the phone to cancel it and Mr. Mexic said he couldn't cancel it because he had just finished ordering it that morning, so Karl said he was sorry, there was nothing he could dohe had to cancel ithe said, okay, if you change your mind, call me and that was the last until we received the payment book."
In response to a question by the court she said:
"Q When was this demand made on you for a hundred dollars? Which visit was that on?
"A Thursday night, the first night. He said that he would hold his order until we brought in that hundred dollars. He knew, I told him I was coming to town that Saturday and he said okay, he was waiting for me that Saturday, so instead of going in, Karl had called him up and cancelled."
*880 Mr. William Mexic, plaintiff's only witness, testified:
"A The couple came in to purchase a bridal set and wedding band and this set that they liked didn't come in the white gold. They asked me to order it for them in white gold and to have it the following week because they were anxious to have it. They gave me $20.00 deposit and I ordered it immediately.
"Q Where did you order the rings from?
"A New York.
"Q How long did it take to get the rings in?
"A I had it in in 5 days.
"Q Did you notify Mr. and Mrs. Sauviac when the rings came in?
"A I did.
"Q What happened at that time?
"A Mrs. Sauviac came in to look at the rings, but did not pick them up.
"Q Did you offer them to her?
"A Yes."
He was not asked on the witness stand why Mrs. Sauviac "did not pick them [the rings] up," nor did he say. But it is significant that he did say under oath in answer to interrogatories propounded:
"Mrs. Sauviac came into the store and she was advised that plaintiff had the merchandise ready and available for delivery, at which time she refused to accept said delivery because she did not have sufficient money with her to make the additional down payment as agreed. (Emphasis added.)
Furthermore, plaintiff's counsel acknowledges this agreement in his "Statement of the Case" in his brief in the following language:
"Mr. Sauviac agreed to purchase the rings for the sum of $449.10 (including taxes), and made a $20.00 deposit at that time, agreeing to the payment of an additional $100.00 approximately one week later, all as ismore [sic] fully shown by the sales ticket of Mexic Bros., Inc., marked P-1 for identification and filed in evidence herein."
The foregoing statements by Mr. Mexic and his attorney, considered in connection with all the other testimony on this point, clearly corroborate the contention of defendants that the sales slip signed by them did not contain the entire agreement and that the $20 deposited on October 13 was in the nature of earnest money which would be forfeited if the additional payment of $100 was not made to complete the sale. It is our opinion that Mexic did not consent to the sale for a down payment of $20 and that, if defendants had demanded delivery without making "the additional down payment as agreed" (using the words of Mr. William Mexic), delivery would have been refused.
We think this conclusion is further supported by the fact that no entry of payment of the $20 was made on defendants' account until October 20, as shown by plaintiff's sworn statement of account made a part of its petition, after defendants had told Mr. Alexic by telephone on the previous Saturday[1] of their decision to forfeit the $20 deposit and cancel the order.
*881 The agreement between the parties was not a completed sale but was a promise to sell upon payment of an additional $100. The contract was made with the giving of earnest money, and the contracting parties were at liberty to recede from the promise. The buyer, having elected to recede, merely forfeits the deposit. LSA-C.C. art. 2463. It is not required that the deposit or payment be specifically designated as earnest money. Unless the contrary is declared, it is presumed to be earnest money, and the seller is not entitled to specific performance. Haeuser v. Schiro, 235 La. 909, 106 So.2d 306 (1958); Livingston v. Southport Mill, Ltd., 173 La. 120, 136 So. 289 (1931); Maloney v. Aschaffenburg, 143 La. 509, 78 So. 761 (1918); Miller v. Smith, 151 So.2d 83 (La.App. 1st Cir. 1963); Searcy v. Gulf Motor Co., 37 So.2d 445 (La.App. Orleans 1948).
The trial court was in error in finding that there was a completed sale between the parties, and its judgment, based entirely on the sales slip, cannot be maintained.
The judgment before us is silent on the issue of defendants' demand in reconvention. The reason for the omission of any reference to it is clearly implied in the judgment itself: since the trial court awarded plaintiff a judgment on the merits on the principal demand, under the facts of this case it would have been inconsistent to make any award in favor of defendants on their reconventional demand. The trial court obviously intended to reject it.
Since this court is now reversing the judgment on the principal demand, we are faced with the question of what action we are empowered to take on a demand on which the judgment below is silent. We are satisfied that the answer is found in our jurisprudence in Villars v. Faivre, 36 La.Ann. 398, 400 (1884), in which the Supreme Court said:
"Our jurisprudence has rested on a solid foundation, the rule that all the issues presented by the pleadings, and on which evidence has been offered, will be considered as disposed of by a final judgment in the cause, and that demands passed over in silence must be considered as rejected in the absence of a special reservation. * * *"
This rule was followed in Soniat v. Whitmer, 141 La. 235, 74 So. 916 (1917).
Although the Villars and Soniat cases dealt with more limited issues than that presented here (both involved judgments which granted part of the relief sought by a party and were silent as to other demands of the same party), we think the same rule should apply to this case. Issue was joined on the principal demand, the exceptions, and the reconventional demand, and all were tried at one time.[2]
Since the reconventional demand was tried, it must be considered as having been dismissed. This result was also reached by this court in Weitkam v. Johnston, 5 So.2d 582 (La.App.Orleans 1942).
A review of the record convinces us that there is no merit in defendants' reconventional demand.
The judgment in favor of plaintiff, Mexic Bros., Inc., against defendants, Karl W. Sauviac and Mrs. Barbara G. Sauviac, is reversed; and judgment is now rendered in favor of defendants, Karl W. Sauviac and Mrs. Barbara G. Sauviac, against plaintiff, Mexic Bros., Inc., rejecting plaintiff's demand.
The dismissal of the reconventional demand is affirmed.
All costs of both courts shall be paid by plaintiff-appellee.
Reversed in part; affirmed in part.
NOTES
[1] All through the record defendants testified that they first visited the plaintiff's store on Thursday night, October 13, and that the telephone conversation cancelling the order was on Saturday, October 15. Mr. Mexic verified a telephone conversation on Saturday, without fixing the date of the month, two days after the alleged purchase. Reference to the 1965 calendar reveals that October 13 was a Wednesday and therefore Saturday was October 16. This discrepancy is not explained and we attach no significance to it.
[2] A partial judgment on either the principal or incidental demand is authorized under LSA-C.C.P. art. 1915(4) only when the two have been tried separately.