325 So.2d 879 (1976)
FIDELITY STANDARD LIFE INSURANCE CO. et al.
v.
FIRST CITY FINANCIAL CORPORATION et al.
No. 6896.
Court of Appeal of Louisiana, Fourth Circuit.
January 13, 1976.
Rehearing Denied February 10, 1976.
Writ Refused March 19, 1976.
*880 Harry McCall, Jr., Norris S. L. Williams, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, for plaintiffs-appellees.
Michael F. Little, Little, Schwartz & Dussom, New Orleans, P. Wendell Calhoun, Jr., Vidalia, Ga., for defendants-appellants.
Before REDMANN, LEMMON and BEER, JJ.
REDMANN, Judge.
This case presents a complicated, ten-volume record (plus exhibits) of financial transactions manipulated by swindlers. There is some evidence tending to show that officers of both Fidelity Standard Life Insurance Company and First National Bank & Trust Company of Vidalia, Georgiathe only plaintiff and defendant involved in this appealwere less than 100% innocent dupes.
The record as a whole, however, does suffice to support the trial judge's conclusion that defendant bank knowingly took, in pledge on a third party loan, plaintiff insurer's bearer securities without authorization for their pledge from plaintiff (and also dealt with others of plaintiff's securities without plaintiff's authorization). We therefore affirm judgment in plaintiff's favor for their value.
We nevertheless mention, for any reviewing court, that circumstances strongly inclining one towards a contrary result do exist. Perhaps the most difficult to ignore are, first, that plaintiff's vice-president (in his capacity as president of the related First City Financial Corporation) did sign an addendum to defendant's loan commitmentand the commitment called for the pledge of an asset which had to come from plaintiff; and, second, that plaintiff's secretary executed a certificate that a meeting of plaintiff's executive committee approved pledging to a Louisiana bank a $15,000 asset which was supposed to have been delivered with the assets here involved to defendant bank ten days earlier, for conversion into a certificate of deposit not to be pledgedand the allegedly authorized later pledge was to secure a loan to the swindler-"messenger" who was to have taken the assets to defendant in Georgia.
There are of necessity many facts and factual arguments to which we do not advert in this opinion.

Facts
Defendant Georgia bank, through an officer brought to New Orleans the weekend of Saturday, May 18, 1968 for the purpose, negotiated in Louisiana a $330,000 loan to Texas National Capital, Inc. and issued in Louisiana its check dated May 18 on another Georgia bank for that amount. The check bore the notation "This draft to be accompanied by . . . 1,140,635 shs of . . . American Empire Life Corporation." The check was payable to Texas *881 National, First City Financial Corporation and a New Orleans bank, which held the American Empire shares in pledge against a loan to First City, and which on Monday, May 20, accepted the check for collection, ultimately applying its proceeds to pay First City's loan as instructed. (Texas National made this new loan, while having First City co-sign the new note, in order to discharge William B. Abroms's personal guaranty of the earlier loan. In exchange for discharge from that and other guarantees, Abroms had earlier agreed to transfer to Texas National his majority of First City's shares.)
Defendant bank's Louisiana loan commitment to Texas National further obliged Texas National and First City to "cause to be purchased" from defendant a $350,000 certificate of deposit to be pledged to the bank as additional security for the loan. The quoted language, as well as other evidence, supports the conclusion that the $350,000 cash for deposit was not to come from Texas National (which had to borrow $330,000 to pay First City's debt) nor from First City (which couldn't pay its own debt of $330,000), but from some other source. That source is indicated by other evidenceincluding that Abroms was guarantor on the First City loan and on other five- and six-figure loans to American Empire and First City; that Abroms owned the majority of the shares of First City; that First City controlled a substantial block of the shares of American Empire; that American Empire owned all of the shares of plaintiff insurer; that officers and directors of First City, American Empire and plaintiff were interlocking; that defendant bank's officer during the Louisiana negotiations reviewed the financial statements of First City, American Empire and plaintiff insurer (of whom only plaintiff had significant liquid assets), as well as that of Texas National (whose statement defendant's officer characterized as of questionable value because only qualifiedly certified, and by a New Orleans rather than Texas accountant); and that defendant exacted as a condition of the loan a legal opinion that the loan "arrangements" would not violate Louisiana insurance law (although neither Texas National nor First City nor American Empire was an insurance company). Taken as a whole, this evidence supports the conclusion that defendant bank knew that the source of the $350,000 for the certificate of deposit was to be plaintiff insurer.
Plaintiff insurer had not been a party to these negotiations, and its executive committee did not by resolution authorize any pledge of any of the insurer's assets. The executive committee did (at Abroms's instance) by resolution of Tuesday, May 21, authorize withdrawal of $440,000 face value of most bearer securities from their Baton Rouge bank custodian, for conversion into a certificate of deposit in the insurer's name. (An altogether unclear circumstanceperhaps only a diversion by Texas Nationalwas an unsuccessful effort to obtain the certificate of deposit [and the loan with the deposit not as security but only as a compensating balance?] from a second New Orleans bank at this time, when defendant Georgia bank had already issued its check for the loan.) Plaintiff insurer's officers entrusted these securities to a Texas National officer for delivery to defendant bank for conversion into a certificate of deposit.
The Texas National officers were swindlersswindlers whose subsequent involvement in multi-million-dollar international thimblerigging makes the present ploy seem a trifling divertissement.
These Texas National swindlers did not cause the securities' conversion into a certificate in plaintiff's name. Instead, on Thursday, May 23the day on which the other Georgia bank honored defendant's $330,000 check, allegedly after inquiry to defendantthe swindlers delivered in pledge to defendant bank $291,000 of plaintiff's securities, reciting, in an "indenture" pre-dated (as were many documents) to the date of the Louisiana note and check, *882 that the securities belonged to Texas National. The swindlers also persuaded defendant bank at this time (the bank's attorney's receipt is dated May 23) to accept and facilitate encashment of certain other of plaintiff's securities (some of the same series as those "pledged") in order to pay $1,000 to defendant for an NSF check given by one swindler for a money order, $700 to defendant's officer for a loan by him individually to the swindler, perhaps another $1,000 to defendant for another loan to the swindler, $15,000 to the swindlers (Texas National's own officers) as a "loan brokerage fee," $4,500 to the bank's attorney as his feeand $1,000 to the bank as "additional discount" on the loan. Yet another curious result of defendant bank's dealing with the swindlers was a $5,000 loan to one of them, to fund a never-used checking account in the swindler's name over which defendant's own officer was named deputy.
What happened to the rest of plaintiff's securities is not shown in this record. Those defendant bank held in pledge were all sold prior to trial, save a $40,000 certificate of deposit in a Baton Rouge bank which declined to honor defendant's claim.

Jurisdiction
We mention and let fall defendant's argument that it had allowed its check issued in Louisiana to be paid by the drawee bank in Georgia as a "new loan" made in Georgia to Texas National on new terms, including the pledge of $291,000 face value of mostly bearer securities from Texas Nationalthe "new loan" being represented by the same note made in Louisiana and co-signed by First City, which was never present in Georgia to agree to any "new loan."
We pretermit the reasoning from La.C.C.P. 7 by Mexic Bros., Inc. v. Sauviac, La.App.1966, 191 So.2d 873, that incidental demands like defendant's reconvention here constitute a general appearance waiving objection to jurisdiction over the person. We need not answer defendant's attack on C.C.P. 7 and Mexic as deprivations of due process. It is patent that plaintiff's claim against the non-resident bank for return of the pledged securities is one "arising from the nonresident's (a) transacting any business in this state . . ." within the Louisiana longarm statute, R.S. 13:3201. The business defendant transacted in Louisiana included a loan intended (by borrower and lender but not plaintiff) to be secured by plaintiff's assets.

Merits
It is also patent that plaintiff's consent to the pledge of its assets was never given. Plaintiff's executive committee's resolution restricted use of its assets to conversion into a certificate of deposit.
It is further patent that defendant knew of some "adverse claim" as a matter of law, Ga.U.C.C. 109A-8-304(2), as to the securities which it says it believed were Texas National's but which it cashed "for the individual benefit" of Texas National officers (to pay defendant's and its officer's claims against them and commissions to them). The trial judge correctly held defendant liable for the value of these additional securities.
Finally, from the evidence as a whole, the inference is amply supported that defendant bank knew that the securities presented to it and accepted in pledge as Texas National's were not Texas National's but plaintiff's.
Defendant as pledgee was accordingly not a "bona fide purchaser" within Ga.U. C.C. 109A-8-302 because it did not take "in good faith and without notice of any adverse claim . . .."
Affirmed.
*883 BEER, J., dissents with written reasons.
BEER, Judge (dissenting).
I respectfully dissent.
Plaintiffs totally abdicated their responsibilities to their so-called "co-fiscal agents"one obvious swindler and one self-serving manipulator apparently on the brink of serious fiscal difficulty. Their combined bizarre actions in connection with the pledge (and all other pertinent matters) makes it extremely difficult for me to finally conclude (as does the majority) "that defendant bank knew that the securities presented to it and accepted in pledge as Texas National's were not Texas National's but plaintiff's." I agree that this was plaintiff's burden but I cannot agree that it has been successfully carried by any completely credible evidence.
For any reviewing court I mention the additional conclusion on my part that the contentions of the defendant bank are just as difficult for me to acceptand for essentially the same reasons for it, likewise, abdicated its responsibilities to self-serving schemers who were, at best, less than unwitting victims of the swindle.
In my view, neither of the litigating parties have shown a satisfactory basis for judicial resolution of their dispute.

ON APPLICATION FOR REHEARING
PER CURIAM.
Defendant bank complains that we overlook the delivery to plaintiff insurer by Texas National of $880,000.00 face value of worthless securities at about the time plaintiff delivered its $440,000.00 of securities to Texas National. Defendant theorizes that this circumstance proves that the insurer exchanged securities with Texas National. There is not only no evidence and particularly no corporate resolution by the insurerto support this theory: the corporate resolution is to the contrary.
Rehearing refused.
BEER, J., concurs in refusing rehearing.