235 So.2d 193 (1970)
Nelson F. HEBERT, Sr.
v.
Xavier VALENTI et al.
No. 3739.
Court of Appeal of Louisiana, Fourth Circuit.
May 4, 1970.
*195 Edgar J. Monjure and Louis A. DiRosa, New Orleans, for plaintiff-appellant, Nelson F. Hebert, Sr.
John I. Hulse, IV, of Hammett, Leake & Hammett, New Orleans, for defendant-appellee, Xavier Valenti.
Francis G. Weller, of Deutsch, Kerrigan & Stiles, New Orleans, for defendants-appellees, American Elevator & Electric Co. and Maryland Casualty Co.
J. Walter Ward, Jr., of Christovich & Kearney, New Orleans, for third-party defendant, Great American Ins. Co.
Ignatz G. Kiefer of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for third-party defendants and third-party plaintiffs.
Before BARNETTE, Le SUEUR and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
The plaintiff herein, Nelson F. Hebert, Sr., was an employee of Jack Pulitzer & Bro., in the capacity of a shipping clerk. His employer had leased two floors of a building located at 129 Chartres Street, in the City of New Orleans, from Xavier Valenti, defendant herein, and owner thereof. In the building is located a freight-type elevator which the lessee used in conducting his business, and which the lessee had agreed to be responsible for. The lessee, Jack Pulitzer, also had other buildings in his possession which contained elevators, and he had a contract with American Elevator and Electric Company, Inc., for the maintenance and inspection of the several elevators under his control.
On December 18, 1963, plaintiff was in the elevator at 129 Chartres Street together with a fellow employee, Peter Hahlos, over whom he had supervision. The two were on a mission for their employer, Jack Pulitzer & Bro., the essence of which was to remove toys which their employer had stored on the fourth floor of the building, take them down on the elevator, and load them on a truck belonging to Jet Delivery Service. Hebert and Hahlos ascended to the fourth floor of the building, taking with them a hand truck. The elevator stopped a short distance above the fourth floor landing and Hahlos attempted to push the hand truck from the elevator. At this point a wheel on the hand truck became wedged in between the fourth floor landing and the elevator. Efforts to dislodge it were futile and it was decided to lower the elevator and free the wheel in that way. Hahlos who was off the elevator, pulled the cable to start the elevator downward. The plaintiff was standing in the elevator attempting to free the hand truck. At first the elevator moved downward very slowly and in a jerky fashion, but suddenly it descended with great speed. The distance that it fell is in dispute, estimates ranging from three to one and one-half floors, but it was sufficient to produce severe injuries to the plaintiff.
*196 The most plausible explanation of what caused the elevator to fall is to be found in the testimony of the various experts who were heard at the trial. The consensus seems to be that when Hahlos set the controls for descent, the hoist cable began playing out of the drum but because the elevator was stuck at the fourth floor it did not descend. When the hand truck was removed the elevator car, having unwound a length of cable, was free to fall and did so. Travelers Insurance Company, the workmen's compensation insurer of Jack Pulitzer & Bro., paid plaintiff workmen's compensation and medical expenses. Nevertheless plaintiff, alleging that his injuries resulted from defective and unsafe conditions in the elevator, sued Xavier Valenti as owner-lessor of the premises, American Elevator & Electric Company, Inc., as the agency responsible for the maintenance of the elevator, and Maryland Casualty Company as the insurer of American Elevator Company, in tort. Traveler's Insurance Company intervened, seeking recovery of the monies already paid to plaintiff by Travelers in the event of a judgment favorable to him. The named defendants filed third party petitions against Peter Hahlos and Great American Insurance Company, the liability insurer of Jet Delivery Service, alleging that Hahlos was an omnibus insured of third party defendant, in that he was loading a truck belonging to Jet Delivery Service at the time of the accident. Valenti also filed third party petitions against Jack M. Pulitzer, Jack M. Pulitzer & Bro., The Travelers Insurance Company, American Elevator & Electric Company, Inc., and Maryland Casualty Company. Third party defendants Jack M. Pulitzer, Jack M. Pulitzer & Bro., and The Travelers Insurance Company also filed a third party petition against American Elevator & Electric Company, Inc., and its insurer, Maryland Casualty Company seeking indemnity. After several days of trial the lower court rendered judgment against plaintiff, dismissing his suit at his cost, and in favor of all defendants. Plaintiff and intervenor appealed from that judgment.
It seems to us that the crucial question insofar as defendant Valenti is concerned is "who had control of and responsibility for the elevator"? This is so because if Jack Pulitzer, the employer of plaintiff, was the responsible party, then plaintiff's suit must of necessity fall. Under LSA-R.S. 23:1032 it is plain that the Workmen's Compensation Act is an exclusive remedy and deprives employees of the right granted by LSA-C.C. art. 2315 to tort actions against their employers.
Plaintiff argues strongly that defendant Valenti is, as owner of the building in which the accident occurred, the responsible party. He cites articles 670, 2322 and 2695 of our Civil Code, as well as a series of cases from our jurisprudence which he states stand for the proposition that a landlord is subject to "liability without fault" for personal injuries sustained by his tenant or others through the defective condition of the premises whether he was aware of the defect or not. He also cites but attributes little importance to, LSA-R.S. 9:3221 which reads as follows:
"§ 3221. Assumption of responsibility by lessee; liability of owner.
"The owner of premises leased under a contract whereby the lessee assumes responsibility for their condition is not liable for injury caused by any defect therein to the lessee or anyone on the premises who derives his right to be thereon from the lessee, unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time."
As can be clearly seen this statute allows the landlord to escape the strict liability imposed by the aforementioned civil code articles and transfers his responsibility, insofar as persons on the premises who derive their right to be thereon from the lessee *197 are concerned, to the lessee through contract. This contract may be either oral or written. Atkinson v. Stern, La.App., 175 So. 126; Phillips v. Cohen, La.App., 183 So.2d 473, writs refused, 249 La. 196, 186 So.2d 158. We must therefore look to see whether there was such an assumption of responsibility on the part of the lessee, Pulitzer, and if so, whether there existed a defect of which Valenti knew or should have known.
Jack Pulitzer and Xavier Valenti entered into a written contract of lease on January 1, 1962, which was for the duration of one year or until December 31, 1962. This lease was for the rental of the third floor at 129 Chartres Street in New Orleans at the price of $65.00 per month. The lease further provided that, "Lessee to pay operation cost of elevator and utility bill for elevator." Pulitzer's intention was to use the third floor as a storage area for the toys and novelties which he was in the business of selling, an activity requiring the use of a freight elevator. It is clear to us, especially from the testimony given by both Valenti and Pulitzer that the parties' intention was that the use of the elevator in question should pass to Pulitzer vesting him with full responsibility for, and control over, it. Mr. Valenti's testimony is to the effect that he seldom, if ever, used the elevator and that he had a stairway installed so he would not have to make use of the elevator since he did not wish to maintain it. Mr. Pulitzer testified, as did Mr. Valenti, that he assumed that he, Pulitzer, would be responsible for the elevator. Pulitzer maintained a verbal contract with American Elevator Company whereby they would periodically oil, grease and inspect the elevator whereas Valenti had none. All of the city permits, save one, for operation of the elevator were addressed to Pulitzer. Pulitzer paid for all repairs, maintenance, and inspections of the elevator. He further maintained insurance on it. We therefore conclude that under the written lease Pulitzer and not Valenti was responsible for this elevator. That lease also contained the following provision:
"Lessor shall not be liable for any damage to person or property sustained by the Lessee or any other persons, and any such liability is assumed by Lessee."
Clearly this provision was intended to invoke LSA-R.S. 9:3221 quoted hereinabove, and relieves Valenti of any responsibility for injuries caused by the elevator unless the injuries were caused by a defect of which he knew or should have known.
The written lease expired on December 31, 1962; however, Pulitzer remained in possession of the premises by verbal agreement with Valenti. By the testimony of both parties to the lease it was intended by them that all the provisions of the written lease should remain in full force and effect between them and that nothing should be changed save only that Pulitzer would have the right to use an additional floor, i. e., the fourth floor, for an added rent of $35.00 per month. Much is made by counsel of whether this constituted a tacit reconduction of the old lease or a new verbal lease between Valenti and Pulitzer; however, insofar as the issues of this case are concerned the point is moot since if the old lease was reconducted, then all its provisions were in effect by written contract, and if it was not, then they were still a part of the new verbal lease by agreement of the parties. It is well settled in our jurisprudence that in interpreting the terms of a contract, the intention of the parties is the law of the case. LSA-C.C. arts. 1945, 1950; Welch-Eckman Const. Co. v. Vancouver Plywood Co., La.App., 213 So.2d 134; Grace v. Morales, La.App., 210 So.2d 60. Furthermore in interpreting a lease contract the court may consider all pertinent facts, including the interpretation given the contract by the parties themselves. Maxwell, Inc. v. Williams-McWilliams Industries, Inc., La.App., 128 So.2d 674.
*198 Reinforcing the testimony of Valenti and Pulitzer is the fact that Pulitzer continued through the time of the accident and beyond, to pay for all services and inspections of the elevator, and permits from the city continued to be issued in his name.
Our conclusion regarding responsibility for the elevator under the written lease is therefore also valid at the time of the accident and defendant Valenti cannot be looked to for recovery by plaintiff unless there existed a defect in the elevator of which he knew or should have known. We therefore turn our attention to the elevator itself, as well as the possible existence of any circumstances from which negligence could be attributed to either defendant.
The record discloses that the elevator at 129 Chartres Street was of ancient vintage, having been installed around the turn of the century, and was of the drum type and nonautomatic. It stopped automatically only on the top and bottom floors, at which points it was set so that it would stop slightly above the floor when empty. Thus when loaded it would not stop below the floor, facilitating the unloading process. The elevator's drum on which the hoist cable was wound operated with direct electrical current. Most of the remainder of its parts including the controls, governor, and safety devices were mechanical.
The elevator was inspected regularly at the direction of Pulitzer by American Elevator and Electric Company. It was also inspected yearly by the representatives of the City of New Orleans. Pulitzer's employees, including the plaintiff, made regular use of the elevator to haul his goods. None of these people ever pointed out, complained of, or as far as we can tell from the record, noticed any specific dangerous condition. The only exception occurred when the city made a recommendation that the gates at the landings be kept closed. Although the elevator was very old and all of the persons using and/or inspecting it were well aware of the fact, it always functioned normally both before and after the accident. No major repairs were ever made on the machine. Furthermore, while this elevator did not meet the standards which modern elevators must meet in order to be approved in the City of New Orleans it never failed to receive permits for operation from the city. This is due to a provision in the American Standard Safety Code as adopted in the Building Code of the City of New Orleans permitting elevators which are not dangerous to life or health to operate with whatever equipment was legal at the time of the adoption of the Code, if they were so operating at that time. Plaintiff complains that had the elevator been equipped with a safety apparatus known as a slack cable device, the cable would never have unwound while the car was stationary and the accident would not have happened. To sustain this allegation he called an expert witness, the president of an uninvolved elevator company, who testified that such a device could have been installed on the elevator at a modest cost and would have prevented the accident, since it would have stopped the cable from playing out while the car was stationary. The defendants also called an expert, one Mr. Payes, the current Plan Examiner and former Elevator Inspector for the City of New Orleans, who testified that the city does not require slack cable devices on elevators which were operating prior to the adoption by the city of the American Standard Safety Code, as this one was, and that he had never seen such a device on this type of elevator either as original equipment or as a later addition. He further testified that to attempt to install such a device on this type of elevator would be prohibitively expensive and might be hazardous. Most significantly he stated that the city would not issue a permit for the installation of a slack cable device on this elevator and hence it could not be legally installed. We cannot say therefore that the defendants were negligent because of the lack of a slack cable device on the elevator.
*199 Plaintiff next alleges that the safeties on the elevator did not operate as they should have and that had they done so the elevator would either have stopped or fallen more slowly. These safeties are actually wedges which are set in operation by a governor. The governor was set at the time the elevator was installed and we gather was calibrated to operate the safeties if the elevator dropped at a speed in the neighborhood of 175 feet per minute. If the elevator drops faster than the pre-set speed, the governor trips the safeties wedging them against the guide rails, either stopping or significantly slowing the elevator. The only practical means of inspecting the condition of these safeties is by visual inspection and manipulation to see that they are free. This is the sort of inspection that was carried out by the City or its representatives each year and by American Elevator at more frequent intervals. Insofar as any of the inspectors could ascertain the fact, the safeties were in functioning order. The experts who testified on this point could not say with any certainty whether the safeties worked at the time of the accident. Mr. Payes testified that the safeties could well have functioned but that the subsequent operation of the elevator would have removed any evidence of their application from the guide rails since it would smear grease over any marks that the safeties might have left. Another of defendants' experts expressed the same opinion. Plaintiff's expert did not think the safeties worked at all but conceded that his inspection of the elevator revealed no reason why they should not accept perhaps an accumulation of grease and dirt. Another of defendants' experts, the mechanic that generally serviced the elevator, agreed that the safeties probably did not apply, basing this opinion on the fact that he found no marks on the guide rails after the accident. Of course as stated by the other witnesses, the grease could have covered the marks. This expert witness expressed the opinion, concurred in by Mr. Payes, that the elevator never fell fast enough to trip the safeties. This is explained by the fact that the machinery which operates the elevator is located on the third floor, hence when the cable played out it would act as a counterweight on the elevator which was on the fourth floor, and thereby a free-fall situation would be prevented. In any event there was general agreement that the only practical way to test these safeties is by visual inspection and manipulation to see that they are free. This is the sort of inspection performed by American Elevator and Electric Company and by the City's inspector or its representatives. No defect was ever noted by either and we therefore cannot say that defendant Valenti could have known or should have known of any defect or dangerous condition on the elevator. Nor can we say that American Elevator and Electrical Company was in any way negligent since it performed its inspections in what was agreed to be the only practical way.
Finally, much is made by plaintiff of the gap that existed between the elevator platform and the fourth floor landing. The highest estimate of the size of this gap was made by plaintiff's expert witness, who said it to be 2½ inches. All of the expert witnesses who testified on the point agreed that the maximum gap allowed under the American Standard Safety Code is 1½ inches. However, Mr. Payes testified that wider gaps are tolerated in elevators which were in operation prior to the city's adoption of the Code. These are tolerated and permits are issued for the operation of such elevators, he said, so long as they are not hazardous. He further testified that the gap is one of the points checked by the inspectors, that no recommendation had ever been made by the city that the gap in this elevator be narrowed, and that the city had always issued permits for the operation of this elevator. Hahlos, who testified that the wheels on the cart which caught in between the elevator and the floor, were from four to five inches in diameter, said that they *200 never had any trouble wheeling the carts over the gaps. On this particular occasion he testified that the elevator stopped higher above the landing than usual, perhaps up to four inches above it, and that the wheel stuck sideways in the gap as he tried to roll the cart off the elevator. Yet he was certain and it is clear from the photographs received in evidence, that the lip or edge of the elevator platform was of sufficient width so that one standing on the floor could not see the bottom of the elevator if the platform were four inches above the floor. Thus if the elevator did in fact stop four inches above the landing, this would in no way increase the size of the gap between the platform and the landing. The gap being within tolerable limits, plaintiff's allegations of negligence on this point must also be rejected.
It is elementary in our law that the judgment of the trial judge who saw and heard the witnesses may not be disturbed by an appellate court in the absence of manifest error. While the trial judge in this case gave no reasons for his judgment, it is consistent with our own findings that there was no negligence on the part of defendant, American Elevator and Electric Co., that defendant Xavier Valenti was not responsible to plaintiff under the facts of this case, but rather Jack Pulitzer, if anyone, was the responsible party, and that plaintiff's only remedy against him lies in the Workmen's Compensation Act. In view of these findings we need not reach the issue of contributory negligence on the part of plaintiff, and we find no error in the trial court's judgment.
With regard to defendants' third-party demands against Great American Insurance Company and Peter Hahlos the judgment of the trial court was silent, and this silence constitutes a rejection of said third-party demands. LSA-C.C.P. art. 1915; Mexic Bros., Inc. v. Sauviac, La.App., 191 So.2d 873. This portion of the judgment not having been appealed, it has become final and is not before this court.
For the foregoing reasons the judgment of the trial court is affirmed at appellants' cost.
Affirmed.