325 So.2d 354 (1975)
David L. CAGLE, Plaintiff-Appellee,
v.
SPADE DRILLING COMPANY, INC., and Bituminous Casualty Corporation, Defendants-Appellants, and
Noble Wiley and Travis Goss, Defendants-Appellees.
No. 5127.
Court of Appeal of Louisiana, Third Circuit.
December 31, 1975.
*355 Gold, Hall, Hammill & Little by James D. Davis, Alexandria, for defendants-appellants.
Reeves, Lossin & Owens by Jack F. Owens, Jr., Harrisonburg, for plaintiff-appellee.
Before HOOD, CULPEPPER and MILLER, JJ.
HOOD, Judge.
Plaintiff, David L. Cagle, claims damages and workmen's compensation benefits resulting from injuries which he sustained while working for Spade Drilling Company, Inc. Defendants are Spade Drilling Company, Bituminous Casualty Corporation, Noble Wiley and Travis Goss. A default judgment was rendered against defendant Goss, condemning him to pay damages to plaintiff, but that judgment was set aside and a new trial was granted.
After trial on the merits, judgment was rendered by the trial court in favor of plaintiff, condemning Spade Drilling Company to pay plaintiff workmen's compensation benefits of $31.92 per week for 500 weeks, and assessing all costs of the suit to Spade Drilling Company and its insurer.
Defendants, Spade Drilling Company and Bituminous Casualty Corporation, appealed. Plaintiff answered the appeal, praying principally (1) that the default judgment rendered against Goss be reinstated; and (2) that penalties and attorney's fees be allowed; and alternatively, (3) that damages be awarded in favor of plaintiff against Wiley and Goss; and (4) *356 that the amount of compensation benefits which Spade Drilling Company was condemned to pay be increased from $31.92 to $65.00 per week, for 500 weeks.
The principal issues presented, we think, are whether any of the defendants were negligent, and whether plaintiff has recovered from the injuries and resulting disability which he sustained as a result of the above accident.
Cagle sustained an injury to his right knee on October 26, 1973, while working as a roughneck for Spade Drilling Company. That company was engaged in drilling an oil well at that time, and plaintiff was assisting in moving some drill pipe from a pipe float to a pipe rack. While doing so, he stepped in a rut which had been made by a caterpiller tractor, causing him to slip and to twist and injure his right knee. His injury was diagnosed later as a torn medial meniscus.
Bituminous was the liability and the workmen's compensation insurer of Spade Drilling Company when plaintiff was injured, and the parties stipulated that there was also "executive officer coverage with the same company" at that time. Defendant Goss was president of Spade Drilling Company and the owner of all of the stock in that corporation. Wiley was working as a "tool pusher" for that company, and he was in charge of the operations which were being conducted at the rig where the accident occurred. He was not an officer, director or stockholder of the corporation.
Although the judgment appealed from did not specifically reject plaintiff's demands against defendants Wiley and Goss, it is apparent from the reasons for judgment assigned by the trial judge that the court intended to do so. The issue of whether those defendants were liable to plaintiff was presented by the pleadings, and evidence was received relating to that issue.
The law is settled that all of the issues presented by the pleadings and on which evidence has been offered will be considered as having been disposed of by a final judgment in the cause, and that demands passed over in silence will be considered as having been rejected by the trial court in the absence of a special reservation. Where a suit against two or more defendants is tried on its merits, and a final judgment is rendered against some of them, being silent as to the others, the judgment will be considered as having rejected plaintiff's demands against the defendants not mentioned in the decree. Villars v. Faivre and Matthews, 36 La.Ann. 398 (1884); Mexic Bros., Inc. v. Sauviac, 191 So.2d 873 (La.App. 4 Cir. 1966); Hebert v. Valenti, 235 So.2d 193 (La.App. 4 Cir. 1970); Gulfco Finance Company of Livingston v. Lee, 241 So.2d 301 (La.App. 1 Cir. 1970); Soniat v. Whitmer, 141 La. 235, 74 So. 916 (1917). See also 32 La.L.Rev. 315.
We conclude that the judgment rendered in the instant suit rejected plaintiff's demands against Wiley and Goss. Those two defendants did not appeal, and neither did plaintiff take an appeal. Plaintiff thus is not entitled to have the judgment of the trial court modified, reversed or revised insofar as it rejected his demands against Wiley and Goss. Broussard v. Annaloro, 265 So.2d 648 (La.App. 3 Cir. 1972); Shaw v. The Travelers Insurance Company, 293 So.2d 568 (La.App. 3 Cir. 1974).
Bituminous, however, was the liability insurer of Goss, and perhaps of Wiley, and as such it is responsible within policy limits for the damages which plaintiff might have been entitled to recover from those defendants. Bituminous appealed, and plaintiff answered that appeal, so plaintiff is entitled to have the judgment revised insofar as its demands against Bituminous are concerned. It is necessary, therefore, for us to determine whether Wiley and *357 Goss, or either of them, were guilty of actionable negligence, and thus whether they would have been personally liable as executive officers of Spade Drilling Company for the damages sustained by plaintiff, except for the latter's failure to appeal.
In Canter v. Koehring Company, 283 So.2d 716 (La.1973), our Supreme Court set out the criteria for imposing individual liability upon executive officers for the breach of employment-imposed duties. Neither in that case nor in any other case, however, has individual liability been imposed on an executive officer unless the evidence established that there was some breach of duty, some negligence or some fault on the part of that officer. We have decided that the evidence fails to show any breach of duty, negligence or fault on the part of defendants Wiley and Goss.
The drilling rig on which plaintiff was working was located in a bean field. The rig and other drilling equipment had been moved to that location by trucks, floats and caterpiller tractors. The trucks and caterpiller tractors had made numerous ruts on the ground in and around that area. It rained almost every day immediately after the rig was moved, and a day or two before the accident occurred there was a two-inch rain in that area. On the day of the accident the ground was very wet, with water standing in some of the truck and caterpiller tractor ruts.
A float, or trailer, loaded with drill pipe had been backed up beside or next to a stationary pipe rack immediately adjacent to the rig, and plaintiff was assisting two fellow employees in moving or "rolling" the pipe from the float onto the pipe rack. In doing so, it was necessary at times for plaintiff to stand on the wet, muddy ground and assist in lifting a joint of pipe from the float to the rack. While lifting and moving a joint of pipe on one occasion, he stepped in a rut which had been made by a caterpiller tractor, and that caused him to slip and to twist and injure his knee.
Plaintiff contends that Wiley and Goss were negligent in having failed to provide him with a safe place in which to work, and thus in subjecting him to an unreasonable risk of injury. He argues, more specifically, that those defendants were negligent in having failed to see that the float, or trailer, was level with the pipe rack and in proper position before requiring plaintiff to assist in moving the pipe, and in having failed to provide plaintiff with a proper "footing or flooring" on which to work.
Plaintiff estimated that the float was "maybe eight inches or a foot" from the pipe rack, and that it was six inches, more or less, lower than the rack, making it necessary for him and his fellow employees to lift the pipe up a few inches in order to move it onto the rack. He stated that the float sank down in the mud after it had been placed in that position, causing it to be unlevel and lower than the pipe rack. He testified that if the float had been level with the pipe rack, it would not have been necessary for him to stand on the ground and lift the pipe up to the rack, and that he thus would not have stepped into a rut and slipped as he was moving the pipe.
Cagle was thoroughly familiar with oil field work. He had been employed to work on drilling rigs for about three years, he had moved pipe from floats to pipe racks on prior occasions, and he had been working on the rig where this accident occurred for five or six days before he was injured. He knew that there were caterpiller tractor ruts on the ground at the exact place where he was working, that it had been raining, and that there was water and mud on the ground and in the ruts at that location. He conceded that the area was properly lighted and that he could see the rut into which he stepped. He stated "there was water in the rut, but I could see the rut."
There is a conflict in the evidence as to whether the bed of the float was actually lower than the surface of the pipe rack.
*358 Defendant Wiley, the tool pusher, testified that there may have been a difference of "an inch or two" between the level of the pipe rack and the float, but that it is never possible to get the float and the pipe rack "perfectly even." Lester Hardy, who was working on the rig when the accident occurred, testified that he watched plaintiff and his co-employees rolling the pipe from the float to the pipe rack, that "there's just one way to do it" and that they were rolling the pipe as it is usually done, that the pipe float was set "up against" the pipe rack, and that he didn't recall whether they were at the same level. James L. Cagle, another roughneck on the job, testified that the float was higher, instead of lower, than the pipe rack, that the float was "as close as they could get it" to the pipe rack, and that he continued to unload the pipe, the same way that plaintiff had done it, immediately after plaintiff's shift ended a few minutes after he was injured.
Plaintiff, when asked whether the level of the float could have been corrected, stated that the only way to correct it was by moving the pipe float out, leveling the ground with a caterpiller tractor, and then moving the float back in. He conceded, however, that he "couldn't say whether that would hold it up or not, because it was muddy, and like I said, everything was sinking into the mud."
The trial judge held that "there was no negligence proven against either Goss or Wiley, nor was it proved that they knew of any defect in the oil rig."
We agree with the conclusions reached by the trial court. We find that there was no duty on the part of any of the defendants to maneuver the float into such a position that it was exactly even or level with the pipe rack, even if that were possible. Also, there was no duty on their part to construct a platform or floor on which plaintiff or other employees could stand while rolling the pipe from the float to the pipe rack. Plaintiff was an experienced oil field worker. He was aware of the fact that the ground was muddy and that there were ruts at the place he was working. He, in fact, could see the rut into which he stepped. He was accustomed to moving pipe from a float to a pipe rack, and he was thoroughly familiar with the dangers associated with performing that type work.
Our conclusion is that there was no breach of duty, no negligence, and no fault on the part of either defendant Wiley or defendant Goss. We thus affirm that part of the judgment appealed from which rejects plaintiff's demand for damages against those defendants or their insurer, Bituminous.
We turn now to the question of whether plaintiff has recovered from the injuries he sustained as a result of the above accident.
Cagle was treated initially by Dr. William Coney, a general practitioner. A few days after the accident occurred, however, plaintiff was referred to Dr. Eugene Taylor, an orthopaedic surgeon, who treated him thereafter for his injury. Dr. Coney did not testify at the trial, and he thus has expressed no opinion as to the nature, extent or duration of plaintiff's disability.
Dr. Taylor first examined plaintiff on November 5, 1973, and concluded at that time that his injury consisted of a strain of the knee, with the possibility that "he may have torn his meniscus." He released plaintiff to return to work on November 12. Two days later, however, plaintiff returned with the complaint that his knee had locked and that he had experienced more pain as he was climbing a fence. Dr. Taylor then concluded that he had a torn medial meniscus. He performed surgery on Cagle's knee on November 21, removing the torn cartilage, and plaintiff's recovery from that surgery was uneventful. Dr. Taylor released plaintiff to go back to his regular employment as a roughneck on January 3, 1974. He suggested that plaintiff *359 return for another examination about three months later, but plaintiff did not do so. Dr. Taylor felt that plaintiff had fully recovered from that injury by January 3, 1974, without any residual disability.
Dr. F. C. McMains, also an orthopaedic surgeon, examined plaintiff on March 6 and on September 11, 1974. He found that plaintiff had made an excellent recovery from his surgery and that he could return to work as a roughneck at the time he first saw him. Dr. McMains felt, however, that although plaintiff could return to heavy manual labor, he nevertheless had a 10 to 15 percent permanent disability of the leg. He reasoned that after the removal of a torn cartilage, the knee is "never as good a knee as it used to be", and that "the patient 10, 15, 5 or how many years down the road is more likely to and very likely will develop a certain amount of traumatic arthritis in the knee as a result of the loss of the shock absorbing power of the knee cartilage."
Both of the medical experts who testified, therefore, agree that plaintiff recovered from his disability by January 3, 1974, and that he has been able to perform heavy manual labor, and particularly the work of a roughneck, since that time. Dr. Taylor feels that plaintiff has no residual effects of his injury, while Dr. McMains feels that, although plaintiff is able to return to his former employment, he has a 10 to 15 percent permanent loss of use of the leg.
Plaintiff, commendably, concedes that he "probably" could perform the work of a roughneck now if he had a job, and that he "would have to try it to know."
The trial judge, in his written reasons for judgment, concluded that plaintiff was able to return to work on January 3, 1974, but he accepted Dr. McMains' testimony that plaintiff has some residual disability of his leg. Although Dr. McMains estimated a 10 to 15 percent disability of the knee, the trial judge felt that that was "a bit conservative," and he held that "a 20 percent disability would be more in line. . . ."
We conclude that plaintiff recovered from his disability by January 3 1974, and that he has been able to perform heavy manual labor, and particularly the duties of a roughneck, since that time. We cannot say, however, that the trial judge erred in accepting the opinion of Dr. McMains that plaintiff has sustained some partial loss of the use of his leg as a result of this accident, although we cannot agree that he had a 20 percent loss of use of the leg, since the highest percentage of loss expressed by any medical expert was 15 percent. We have decided that plaintiff sustained a 15 percent permanent partial loss of the use of his right leg as a result of this accident, although it does not disable him from performing the duties of his regular employment.
Cagle thus may recover compensation for the permanent partial loss of the use of function of his leg, under LSA-R.S. 23:1221(4)(h) and 1221(4) (o). Under the cited statute, he is entitled to 15 percent of 65 percent of his weekly wages for 175 weeks.
Plaintiff was earning $159.60 per week at the time the accident occurred. Fifteen percent of 65 percent of $159.60 amounts to $15.56. At the time the accident occurred, the minimum rate of compensation was $17.50 per week. (See LSA-R.S. 23:1202, as amended by Act 71 of 1973). We find, therefore, that plaintiff is entitled to recover compensation at the rate of $17.50 per week, beginning on October 26, 1973, and continuing for a period of 175 weeks, subject to a credit for all compensation payments which heretofore have been made to plaintiff.
We recognize the fact that Cagle was entitled to compensation at the rate of $65.00 per week from the date of his injury, until January 3, 1974. The record indicates, however, that he has already received *360 payment of all of the compensation due during the period of his total disability. And, since defendants are entitled to credit for the amounts heretofore paid, we think the judgment rendered here should be solely for the compensation due under LSA-R.S. 23:1221(4)(h) and 1221(4)(o), subject to a credit for the amounts previously paid.
There is no merit to plaintiff's argument that he is entitled to have the default judgment rendered against defendant Goss reinstated. We have already pointed out that neither Goss nor plaintiff has appealed, and plaintiff thus is not entitled to have the judgment reversed or modified insofar as it rejects his claim against defendant Goss. The answer which plaintiff filed to the appeals taken by other defendants does not entitle him to have the judgment modified as to a non-appealing defendant.
Plaintiff also contends that he is entitled to recover penalties and attorney's fees from Spade Drilling Company and its insurer, Bituminous.
The evidence does not show when compensation benefits were paid to plaintiff. He alleges in his petition only that "defendant has failed and refused to pay plaintiff any compensation since January 6th or 7th, 1974," which was after Dr. Taylor had released Cagle to go back to work. This at least implies that payments were made regularly up to that time. Plaintiff admits in his testimony that he has received some compensation payments, and he alleges in his answer to this appeal that defendants were arbitrary in failing "to continue to pay," such benefits. The evidence thus does not show that defendants have failed to pay compensation benefits as they became due.
Assuming, however, that weekly compensation payments have not been made promptly since January 3, 1974, the evidence shows that defendants nevertheless were not arbitrary or capricious in failing to make those payments timely.
Dr. Taylor concluded originally that plaintiff had sustained only a relatively minor injury, and that he recovered from it within three weeks after the accident occurred. Plaintiff sustained another accident two days after Dr. Taylor found that he was able to return to work, while he was climbing a fence. That accident did not occur during the course of his employment, and a serious question was presented as to whether the torn medial meniscus was sustained as a result of the work-connected accident or as a result of the accident which occurred while he was climbing the fence.
Dr. Taylor also reported after he had performed surgery on plaintiff's knee, that Cagle had fully recovered from his injury by January 3, 1974, without any residual disability. The medical evidence is uncontradicted to the effect that plaintiff has not been disabled since that date, the only disagreement between the two doctors who testified being as to whether plaintiff sustained a partial loss of the use of a member as a result of the accident. Dr. McMains, the only doctor who felt that plaintiff suffered a partial loss of use of the leg was not a treating physician, and he did not make that finding until more than two months after Dr. Taylor had reported that plaintiff was fully recovered. The evidence shows that plaintiff has performed heavy manual labor since that time.
In view of these conflicts in the medical testimony, and some uncertainty as to the cause and extent of plaintiff's injury, we do not find that defendants were arbitrary or capricious in failing to pay compensation benefits to plaintiff promptly, if they in fact failed to do so.
Finally, defendants contend that plaintiff did not sustain a torn medial meniscus as a result of the work-connected accident which occurred on October 26, 1973, but that instead he sustained that injury two or three weeks later as the result of an accident which occurred at his home, while *361 he was not in the course of his employment.
Plaintiff testified that on or about November 14, 1973, after Dr. Taylor had released him to go back to work, he "started to climb over a fence," that his "leg caught again," and that he fell, causing him to suffer pain in his knee. The trial judge obviously concluded that the torn medial meniscus was sustained as a result of the first accident, and not while he was climbing the fence, and that plaintiff thus is entitled to workmen's compensation benefits for his injury. We agree. The evidence convinces us that he sustained the torn meniscus as a result of the first accident, and that his leg "caught" on November 14 because of that condition.
For the reasons assigned, the judgment appealed from is amended and recast to read as follows:
"IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of plaintiff, David L. Cagle, and against defendants, Spade Drilling Company, Inc., and Bituminous Casualty Corporation, in solido, for workmen's compensation benefits at the rate of $17.50 per week, beginning October 26, 1973, and continuing for a period of 175 weeks, with legal interest on each delinquent payment from the time it became or becomes due, until paid, and for all costs of this suit, subject to a credit for all compensation payments previously made to plaintiff.
"IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all of plaintiff's demands for damages, and particularly his demands against defendants Noble Wiley and Travis Goss, be and they are hereby rejected."
All costs of this suit and of this appeal are assessed to defendants, Spade Drilling Company, Inc., and Bituminous Casualty Corporation, in solido.
Amended and affirmed.