526 So.2d 252 (1988)
Rose Marie FOSTER and Danny L. Foster, As Administrator of the Estate of Stephanie Lynn Foster, Appellants,
v.
COLONEL SANDERS KENTUCKY FRIED CHICKEN, INC., et al, Appellees.
No. 19560-CA.
Court of Appeal of Louisiana, Second Circuit.
May 4, 1988.
Rehearing Denied May 26, 1988.
*253 Hall & Golden by W. Eugene Golden, Shreveport, for appellants.
Mayer, Smith & Roberts by Caldwell Roberts, Shreveport, for appellees.
Before HALL, SEXTON and NORRIS, JJ.
NORRIS, Judge.
This is a suit for personal injuries resulting from a shooting that occurred on the drive-through lane of the defendant's fast-food store on North Market Street. A bifurcated trial on liability only was held and judgment was rendered dismissing the plaintiffs' claims. The plaintiffs now appeal, advancing three assignments of error:
(1) The trial court erred in finding that defendant Holland Foods Inc. was free of negligence.
(2) The trial court erred in failing to assess percentages of fault among the several defendants.
(3) The trial court erred in not rendering judgment against the parents of the minor tortfeasors.
For the reasons expressed, we affirm.

FACTS
The plaintiff, Rose Marie Foster, and her eleven-year old daughter, Stephanie Lynn Foster, went to the Kentucky Fried Chicken Store at 1801 North Market around 7:30 p.m. on December 22, 1982. As she drove into the parking lot she saw three young boys standing near the corner of the building with their arms crossed. She testified she was not afraid and had never been afraid to go to Kentucky Fried Chicken. She continued driving to the rear of the building and stopped at the menu board to place an order. Stephanie noticed the three young boys approaching the car and told her mother. Mrs. Foster glanced over her shoulder and saw the boys walking toward her car, spreading as to surround the car. *254 She attempted to accelerate and pull away but one of the young assailants brandished a pistol and fired a shot into the car, striking Mrs. Foster in the right arm. She drove to Sammy's Restaurant and phoned the police and an ambulance. The police searched the Kentucky Fried Chicken parking lot and the large grassy field behind it. The search was fruitless but later that night three black minors were apprehended: Anthony "Red" Thomas, Ernest Williams and Jonathon "Johnifro" Taylor. Thomas and Williams gave incriminating statements to the police; Thomas also testified at the instant trial. All were adjudicated delinquents.
Shortly before the shooting, someone had called the Shreveport Police Department to report suspicious-looking persons standing near Midco, a machine shop next to Kentucky Fried Chicken. Officer Eloise Lewis was dispatched to the scene. She checked the Midco building but found no one. She then went to Kentucky Fried Chicken, parked her marked police car on the front parking lot, went inside and informed the employees of the report of suspicious persons at Midco. She testified that she advised them that there was "probably someone planning on robbing them." She did not, however, drive behind the store to look for suspicious persons. The store employees reported they had seen no one. The assistant manager, Ms. Kirkendoll, looked out the window and saw no one, but she did not exit the building to search. She did not recollect Officer Lewis advising that the store was a likely candidate for robbery. The shooting occurred about 45 minutes after Officer Lewis left.
Another witness, Mrs. Kent, testified she was a customer at Kentucky Fried Chicken that evening and noticed "three black children" looking at cars in the parking lot. She testified she reported this to the cashier; when she left, she saw the kids hiding around the garbage container. When she got home, she called the police; presumably this is the call on which Officer Lewis was dispatched. Ms. Kirkendoll did not recall any customers reporting suspicious characters that evening, and the trial court found that no one had made such a report.
Anthony Thomas, who lived on Pointe Coupee Street across the large field behind Kentucky Fried Chicken, testified that he and his friends, all of whom were minors, had walked down North Market with the intention of robbing someone. Jonathon Taylor had a gun. They had stopped at the nearby Burger King and Pay-Less Shoe Store without success before moving to Kentucky Fried Chicken, where they thought they could "get away with it" because it was darker behind the Kentucky Fried Chicken building and there was a clear getaway through the field. They hid behind the building near the trash bin, intentionally keeping out of sight of the store employees. Thomas did not know whether any police car had driven to Midco or Kentucky Fried Chicken. When Mrs. Foster drove up, they approached her car; when she started to accelerate, Jonathon Taylor fired the gun through the open window. Thomas fled through the back field to Pointe Coupee Street.
Mrs. Foster and her husband, on behalf of Stephanie, filed suit against the owner of the store, Holland Foods Inc., and its insurer, Travelers Insurance. The named defendant, Colonel Sanders Kentucky Fried Chicken, does not operate the stores in the Shreveport area and was dismissed as a defendant. The plaintiffs alleged that the store employees were negligent in failing to prevent the assault after being warned about three suspicious young men on the premises. They also alleged that because of inadequate lighting and unsafe design the store breached its duty of reasonable care to protect a patron from injury. They also sued the parents of the three minor tortfeasors.
The plaintiffs demonstrated that the part of the parking lot where Anthony Thomas and his friends hid waiting for a victim was mostly out of the range of vision of the store employees. When a customer entered the parking lot to use the drive-through window, he had to ride past the lobby, make a left turn around the northwest corner of the building and stop before he turned the southwest corner. On the south side of the building, the pick-up window *255 jutted about four feet out of the wall, with a window facing west. A small mirror is mounted close to the building so that an employee looking out the window can see whether a car is waiting at the menu board. There is a door on the west wall of the building, but employees are instructed not to open it after dark. There are no windows on the west wall.
Plaintiffs' security expert, Mr. Ostendorff, testified this Kentucky Fried Chicken store was unsafe because it was not fenced in, had no surveillance behind the building, had no security guard on duty, was too dark and lacked a "safe design." A safer design, he suggested, would include placing the menu board on either the north or south side of the building, in fuller view of employees. He also suggested a window in the rear wall so that employees in the kitchen could keep an eye on the rear parking lot. A closed circuit TV monitor could also have been installed for surveillance purposes. Hiring a security guard, he testified, would be a relatively inexpensive precaution.
Captain Holt of the Shreveport Police Department was called by the plaintiffs in an effort to establish that this store was located in a dangerous area; the plaintiffs argued the incidence of crime should have alerted a reasonably prudent businessman to take better precautions for his customers' safety. According to Capt. Holt's statistics, Exhibit P-2, Police Beat # 2 registered 167 violent crimes (49 robberies) in 1981 and 219 violent crimes (60 robberies) in 1982. This very Kentucky Fried Chicken store had been robbed about five months before the instant shooting; however, on that occasion, the gunman entered the lobby and held up the cashier. This was, however, the only prior incident at this store, which had been in business nearly three years.
Plaintiffs' expert lighting and electrical engineer, Mr. Purtle, testified that the area around the menu board was illuminated with only 1.5 foot-candles as opposed to 12-16 foot-candles in the middle of the lot. This differential inhibited a quality he called the "see-ability" of the location; a person moving from a bright area to a much darker area might lose as much as 100% of his capacity to see, although the exact effect varied according to circumstances and the individual and was difficult to estimate. Mr. Purtle also testified that the nearby Burger King was lit with only two to three foot-candles, not much brighter than Kentucky Fried Chicken's menu board, but that Burger King's lighting was uniform and therefore more "see-able." He admitted that if a subject entered the parking lot and saw assailants standing there, "see-ability" probably was not a factor.
Mr. Bittle, the vice-president of Holland Foods, testified that when the store was built in March 1980, SWEPCO security lights were installed on the parking lot; these were in place and operative on the night of the shooting. The building complied with all city regulations. He admitted that company policy was not to open the rear door after dark; this would be conducive to letting robbers into the store. He also testified that to place the menu board on the north side of the building would back traffic into North Market Street at rush hour.
As noted, the trial court found that this store provided a reasonably safe place for customers to place orders. The court also found that after Officer Lewis advised the employees that suspicious persons might be lurking in the area, neither the officer nor the employees actually saw any; therefore the defendant could not have actual or imputed knowledge that a criminal act was about to occur. The court dismissed the plaintiffs' claims against Holland Foods. The judgment did not mention the claims against the parents of the minor assailants.

ASSIGNMENT # 1
In order to prevail in a negligence action, the plaintiff must prove that the defendant's conduct was a cause-in-fact of the plaintiff's harm, that the defendant owed a duty of care to protect against the risk involved, that the defendant breached the duty and that actual damages resulted. Harris v. Pizza Hut, 455 So.2d 1364 (La. *256 1984). The first factor, cause-in-fact, is usually enunciated as whether the defendant's conduct was a "substantial factor" in bringing about the harm. Dixie Drive It Yourself Syst. v. Amer. Beverage Co., 242 La. 471, 137 So.2d 298 (1962). In the instant case, cause-in-fact has not been seriously argued on appeal.
The contested issue is whether Holland Foods owed a duty of care to its patrons to protect against the risk involved. In Ballew v. Southland Corp., 482 So.2d 890 (La.App.2d Cir.1986), we enunciated the standard of care:
A business establishment such as the Southland Corporation owes a duty to its patrons to exercise reasonable care to protect them from injury. This duty does not extend to unforeseeable or unanticipated criminal acts by independent third persons. Only when the owner, management or employees of a business have or should have knowledge of a third person's intended injurious conduct that is about to occur and which is within the power of the owner, management or employees to protect against, does the duty arise. Banks v. Hyatt Corp., 722 F.2d 214 (5th Cir.1984); Rodriguez v. NOPSI, 400 So.2d 884 (La.1981); Davenport v. Nixon, 434 So.2d 1203 (La.App. 1st Cir. 1983). When the independent, intentional, tortious or criminal acts of third persons constitute the unreasonable risk, the duty can be discharged by summoning the police at the time the proprietor knows or should reasonably anticipate that the third person poses a probable danger. Rodriguez v. NOPSI, supra; Guidry v. Toups, 351 So.2d 1280 (La. App. 1st Cir.1977), writ denied 353 So.2d 1036 (La.1978); Anderson v. Clements, 284 So.2d 341 (La.App. 4th Cir.1973). 482 So.2d at 893 (footnote omitted).
In Ballew, the assailant had walked to the defendant's convenience store and loitered, oddly and provocatively underdressed for the time of day and year; he followed the victim into the store and asked her for money; he took a soft drink and told the cashier that the victim would pay for it; he went outside and propped his foot on the victim's car; all of this was in plain view of the store clerk, who did nothing. When the victim exited the store, the assailant grabbed her, dragged her behind the building and raped her. We concluded that the assailant's strange appearance and behavior, pestering the victim and others for money, and his general conduct would have alerted a reasonably prudent employee that erratic and perhaps tortious conduct was about to occur. If Southland's employee had timely called the police, the assailant could have been removed, and the abduction and rape averted. We held that the employee should have known of the impending danger and we affirmed a jury verdict for the plaintiff. See also Hardin v. Munchies Food Store, 510 So.2d 33 (La. App. 2d Cir.1987).
In the instant case we have closely examined the evidence to determine whether the trial court's finding that the employees did not "know or should have known" of the intended injurious conduct, is manifestly erroneous. The plaintiff did not prove that any employee ever saw the assailants. The first alleged notice is that given by Officer Lewis. She had actually been sent to Midco and went to Kentucky Fried Chicken only to inquire if anyone there had noticed prowlers on Midco's premises. Although she testified that she told the employees that someone might be planning to rob them, she did not so state in her incident report, and she admitted on cross-examination that she was really just "joking" when she said Kentucky Fried Chicken might get robbed. This attitude is consistent with her decision not to check around the building. Under these circumstances, we cannot find manifest error in the trial court's conclusion that the criminal acts of these third parties were not foreseeable or anticipated by the defendant. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
Even if one of the employees had spotted prowlers, Ballew and the similar cases impose a duty of summoning the police promptly to protect against the tortious act. In point of fact, the police were called; they promptly responded and searched the *257 Midco lot. Nothing was found. It is apparent that the store employees' failure to see the assailants, who by their own admission were trying to hide and perhaps would would have eluded all but a very thorough search, was irrelevant.
Finally there is the alleged notice from Mrs. Kent. The trial court's finding that "she said nothing to the employees" gave us pause in light of her testimony to the contrary. R.p. 350. However, Ms. Kirkendoll did not remember any such warning from a customer. She added that such a warning would have prompted her to call the manager, which she did not do. The trial court obviously made a credibility call in favor of Ms. Kirkendoll and we cannot say it was clearly wrong. Canter v. Koehring Co., 283 So.2d 716 (La.1973). The greater part of the youths' conduct that alarmed her occurred after she allegedly reported their presence to the employees; she testified this later conduct is what led her to call the police.[1] As for what she had noticed before, it may not be particularly unusual for children to admire a brand new red Camaro Z-28 on a parking lot, and the trial court would not be in error to assume that the subsequent conduct and later developments may have confused her recollection of the incident.
In sum, we conclude the trial court was not plainly wrong in finding that the employees did not have actual or constructive knowledge of imminent tortious activity which was within their power to avert. The criminal acts of the three youths, under the circumstances, were unforeseeable and unanticipated.
The plaintiffs next argue that notwithstanding the lack of notice, Holland Foods breached the duty of maintaining a reasonably safe premises for its customers. The substance of the argument is that by failing to adopt the kind of preventive measures outlined by the safety experts, Holland Foods kept a dangerously unprotected premises, under facts and circumstances that should have led it to anticipate criminal activity. The lead case of Harris v. Pizza Hut, supra, clearly delineates the duty to provide a restaurant that is reasonably safe for the purchase and consumption of food by patrons. Generally there is no duty to protect patrons from the criminal acts of third persons. In Harris, the Pizza Hut store on Claiborne Avenue in New Orleans, a recognized high-crime district, had been robbed or burglarized more than 20 times, with at least seven armed robberies in a three-year period. Recognizing the continuous danger of crime, Pizza Hut hired an armed, uniformed security guard to be on duty in the store from 9:00 p.m. to 1:00 a.m. When the armed assailants entered the store, the guard was not at his post but was at a table eating and talking to a friend. When the assailants saw the guard approaching, they opened fire on him, killing the plaintiffs' decedent and injuring her daughter, who were in the line of fire. The supreme court noted that a security guard's primary purpose is to provide a visible presence that might deter crime. Pizza Hut's guard, however, did not make himself visible, and when he thrust himself into the volatile situation of an armed robbery, he escalated the violence that resulted in a shooting and death. The court held that once a business voluntarily assumes the duty of protecting against criminal misconduct, it must discharge the duty with due care; a security guard who fails to act in accordance with established policies and procedures may support a jury finding of causation. 455 So.2d at 1369.
The court carefully stated, however:
By recognizing the duty to provide a safe restaurant, this court is not declaring that all restaurants must have security guards or that an unbearable economic duty must be borne by the restaurants of the state. Indeed it is common knowledge that there are many restaurants which do not require more protection than can be given by the duly constituted police authorities; on the other hand, it is obvious, particularly in New Orleans, *258 that many restaurants feel the need for guards to reassure their patrons and protect their property. 455 So.2d at 1372 (footnote 16).
This makes it clear that a restaurant is not obligated to hire a security guard or to take other precautions against crime unless it decides or should decide that ordinary police protection is inadequate. The duty therefore does not extend to the protection of customers from the criminal acts of third parties unless the risk of crime on the premises was sufficiently foreseeable to require special protection through security measures. Ballew v. Southland Corp., supra; Banks v. Hyatt Corp., supra. In the instant case, the store had been in business for over nearly three years and had experienced only one prior armed robbery. That robbery occurred in the lobby and perhaps would have been averted by the "visible presence" of a guard in the store; the instant offense, occurring behind the store, might not have been. We have also noted the crime statistics filed into evidence. Police Beat # 2 did register 386 violent crimes in a two-year period, but ranked only sixth overall in 1982. The trial judge also observed, with Capt. Holt's approval, that the bulk of Beat # 2's crime occurred in the central part of town, where this store is not located. The circumstances of this case establish that armed robbery of a customer driving through the pick-up lane was a mere possibility and not reasonably foreseeable. It was not enough to activate the duty of taking deterrent or preventive measures.[2]
Furthermore, the evidence shows that the parking lot was lighted well enough for Mrs. Foster, her daughter and Mrs. Kent to see the black youths who, despite their intention to remain hidden, were visible and displayed no menace. It is therefore difficult to see how additional lighting, beyond the security lights already described, would have made the location safer. In sum, we cannot say the trial court was clearly wrong in finding that the store was reasonably safe for the purchase and consumption of food. Under the circumstances, special security measures were not necessary. The judgment absolving Holland Foods of liability must be affirmed. We cannot say the trial court was wrong in finding that the crime statistics and prior crimes did not justify the use of additional security.

ASSIGNMENTS # 2 & 3
By these assignments the appellants urge the trial court should have assessed percentages of fault among the several defendants and rendered judgment against the parents of the minor tortfeasors. Because the judgment absolving Holland Foods of liability has been affirmed, there can be no allocation of fault against this defendant. As for the other defendants, the judgment silent as to them is construed as having denied these demands either for lack of evidence or because they were not properly before the court procedurally. Cagle v. Spade Drilling Co., 325 So.2d 354 (La.App. 3d Cir.1975), and citations therein.
There were three alleged minor tortfeasors, all of whose parents were allegedly sued by the second supplemental petition. The procedural history against each of them is outlined:
1. Jonathon Taylor. Citation issued to "Mr. or Mrs. Taylor" and was personally served on Mrs. Easter Mae Taylor Robinson, who filed declinatory and peremptory exceptions on the grounds that she was Jonathon's grandmother, not his mother. These exceptions were sustained and Mrs. Robinson was dismissed as a defendant. No further service was ever attempted or made on the real "Mr. or Mrs. Taylor."
2. Anthony Thomas. Domiciliary service was made at the home of "Mr. or Mrs. Thomas." Gloria Thomas scrawled an apology at the bottom of the citation form[3] *259 but filed no responsive pleadings. No further action was taken against her. Her son, Anthony "Red" Thomas, testified for the plaintiffs at trial.
3. Ernest Williams. Domiciliary service was made at the home of "Mr. or Mrs. Williams," who never filed any responsive pleadings. On October 10, 1986, a preliminary default was entered "as to Mr. Williams only." No further action was taken except that the default was pointed out to the trial court when trial began on October 23, 1986.
As for "Mr. or Mrs. Taylor," the record shows that no service of any kind was ever made on them. Judgment cannot be obtained against any party who was not subjected to service and who did not waive it. LSA-C.C.P. arts. 6(1), 7; Moore v. CLECO, 273 So.2d 284 (La.1973); Davis v. Tele-Total, 465 So.2d 948 (La.App. 2d Cir. 1985); Rawls v. Damare, 377 So.2d 1376 (La.App. 1st Cir.1979), writ denied 380 So. 2d 72 (La.1980). Thus the trial court's failure to render judgment against these defendants was not erroneous.
As for "Mr. Thomas" and "Mrs. Williams," domiciliary service was made at their respective homes but there is no evidence of an answer, an exception or waiver on their parts; no valid judgment can be rendered against a party with whom issue has not been joined by one of these means. Grey v. Grey, 476 So.2d 1003 (La.App. 1st Cir.1985). There is also no evidence of a preliminary default, which would be the only means of securing judgment against a defendant who never appeared. LSA-C. C.P. art. 1843; Malbrough v. Wheat, 428 So.2d 1110 (La.App. 1st Cir.1983); Bickford v. Lutz, 339 So.2d 1268 (La.App. 1st Cir. 1976). The trial court therefore did not err in failing to render judgment against "Mr. Thomas" or "Mrs. Williams."
As for "Mrs. Thomas," her situation is almost identical to that of "Mr. Thomas" except that she scrawled some kind of response at the foot of the citation form, and that her son appeared and testified at the trial. We have questioned whether her scrawled message could be construed as an answer or appearance. It does not comply with the formal requirements of LSA-C.C.P. art. 1003. However, we can find no authority for treating this sort of communication as an answer. On the contrary, a private letter sent to the trial judge has not been construed as an answer or an appearance in court. Fortier v. Gumelsky, 148 La. 768, 87 So. 741 (1921). Gloria Thomas's message is more akin to the private letter and was not an answer or appearance. Additionally, she did not answer the third supplemental petition and no preliminary default was entered. She was therefore not properly before the court. LSA-C.C.P. art. 1843. We also note that Gloria Thomas herself did not participate in the trial; her son did so after he attained the age of majority. This cannot be construed as an "appearance" on her part. The trial court did not err in failing to render judgment against Gloria Thomas.
As for "Mr. Williams," domiciliary service was made and a preliminary default was entered. At trial, Anthony Thomas testified that the assailant Ernest Williams lived with his mother. R.p. 197. The proof offered does not satisfy the codal requirement that a minor be "residing with" his father in order to activate the latter's financial responsibility. LSA-C.C. art. 2318. The trial court would have been within reason to suppose that Mr. Williams's parental authority was legally disrupted, as by judgment of separation or divorce and that he was not responsible for the minor's acts. Frazer v. Day, 307 So.2d 733 (La. 1975); Toca v. Rojas, 152 La. 317, 93 So. 108 (1922). Because the evidence offered against him did not justify a judgment from the trial court, he is considered dismissed from the suit. Cagle v. Spade Drilling Co., supra.
In sum, the trial court was not wrong to conclude that the procedural requirements to enable judgments to be rendered against Mr. and Mrs. Taylor, Mr. and Mrs. Thomas and Mrs. Williams were not complied with *260 and no judgment could be rendered against them in this lawsuit. We therefore affirm the trial court's refusal to grant a judgment of liability against them. Rights are reserved against these defendants. The trial court's implicit dismissal of Mr. Williams is not manifestly erroneous. The judgment appealed from is affirmed at appellants' costs.
AFFIRMED.

ON APPLICATION FOR REHEARING
Before HALL, FRED W. JONES, Jr., SEXTON, NORRIS and LINDSAY, JJ.
Rehearing denied.
NOTES
[1] The police were actually summoned to Midco, and this is inconsistent with her testimony that she called them to Kentucky Fried Chicken.
[2] This is not to say the evidence of this shooting, together with two subsequent crimes admitted into evidence, might not on some future occasion be construed as grounds of knowledge that the store is in an area prone to crime and that deterrent measures should have been taken.
[3] Mrs. Thomas's message read as follows:

To whom it may concern, I hate what happen but i wasn't there & i don't no what happen, all i no is what they told me abot. My son is doing time. I wish i could do more about it. I am sorry. Gloria Thomas. 1-3-84